Please be seated. We're happy to hear argument when the lawyers are ready in our third case, number 14-781 Carlson v. DynCorp. Good morning, Your Honors, and may it please the Court, my name is Jacob Small, and I represent the plaintiff appellant, Scott Carlson, in this matter. I've reserved four minutes of my time for rebuttal. Your Honors, today we are here to ask the Court to reverse the District Court's dismissal of Mr. Carlson's Second Amendment complaint on the 12b6 motion. And today I'd like to focus on three points, the first of which may be the most poignant considering the way the briefing went, and that is that there is a nexus between, on the one hand, Mr. Carlson's fears about what he observed, the complaints that he made as a result of those fears, and the potential for fraudulent conduct by DynCorp against the government. And as I delve into that point, what I'd like to show is that Mr. Carlson's fears were well-founded. I think that what DynCorp has endeavored to show is that we haven't pointed to fraud, and of course we say that that's beside the point for this 3730H case. The second point I'd like to address, if I'm permitting, is the rule that we've proposed. Of course, we've proposed that internal complaints from employees like Mr. Carlson are in fact protected, if those complaints are based upon an objectively reasonable belief that the conduct the employee was observing were a violation of the statute. We think this is the most reasonable interpretation of the two amendments that we've talked about, the Fraud Enforcement Recovery Act and the Dodd-Frank amendments. Finally, Your Honors, I'd like to spend a little time on Congress's choice of words when they amended the statute, and the use of the word stop in amending 3730H. Of course, as we pointed out in our briefing, it's not possible to stop something that's already occurred, and this goes to DynCorp's contention that there was no fraudulent activity that we were able to point to. Of course, if Mr. Carlson were to stop that activity, that never would have occurred. So turning to my first point, which is again this nexus between Carlson's fears and his complaints, I'll look to the complaint where we alleged a number of things. The first thing that Mr. Carlson found himself observing was USAID's fears that DynCorp's indirect cost rate were lower than they might reasonably be, and there was a period of time when Mr. Carlson interfaced both with his employer, DynCorp, and with USAID in order to try to figure out whether, in fact, what was the situation behind the indirect rate that Mr. Carlson was able to successfully navigate that scenario for DynCorp. The second fact is that during that process, Mr. Carlson raised USAID's concerns with Mr. Kansky on a telephone call, and it was during that call that Mr. Carlson first found himself encountering hostility, and as we allege, Mr. Kansky asked, well, who are you? What are you doing here? Mr. Carlson was, in fact, just doing what he perceived his job to be. The next thing that happened, of course, was that the overhead cost allocation code that Mr. Carlson and his team needed, because their work was business development and much of what they did was overhead, that code was taken away from them. Mr. Carlson's initial fear here was that there was an incentive for employees to commit fraud there, maybe small fraud here or there, by taking the work that they were doing, and in order to create a record that would justify their work, would justify their wages, they'd have to shoehorn the work they were doing on overhead or business and development, they'd have to shoehorn that into a cost code associated with an active project. And, of course, Mr. Carlson raised these concerns. Now, whether it was DynCorp's response, whether it was just what happened next, we don't know. What we do know is that DynCorp chose at that point to say, we want you to take your overhead costs and place them in a code that's not associated with overhead. This is called the Zimbabwe Unbillable Code. And at this point, Mr. Carlson is especially fearful. He doesn't know what's happening with these costs after they're being allocated to the Zimbabwe Unbillable Code. What he does know is that the costs are not for the Zimbabwe project. And Mr. Carlson, at this point, starts to really focus his complaints, as we've alleged, by asking his staff, when you're billing on the Zimbabwe Unbillable Code, raise objections in the system. He's saying in face and in person to his management, Ms. Zeitvogel, we've alleged, that this is improper. We allege that Mr. Carlson did not use the word fraudulent. Of course, he did say that it was not legally compliant. And I'll point out that the Mann case says that when you're looking for indicia of protected activity, calling a practice illegal would qualify as protected activity. I think that that suggests that you don't have to go as far as to say that it was fraudulent. Well, what specific provision of the cost accounting standards was this violating? Well, Mr. Carlson, we allege that this was violating cost accounting standard 420, which is a large body of... Indeed. So tell me how. Tell me what the allegation is. I went and looked at that. That won't do it for me. So tell me what the allegation is here. So cost accounting standard 420, and I hope I can be as specific, Judge Motz, as you prefer. Cost accounting standard 420... Well, what would your client say? Because, for example, if an employee said, what you're doing violates the Constitution of the United States, that doesn't seem to be to put the employer on much notice. So what I'm asking you is what your client said to his employer. Yes, Judge Motz. Did he say, I think what you're doing violates the cost accounting standards? Is that what he said? Yes, Your Honor. Well, that's not much notice, is it? That's not all Mr. Carlson said. Your Honor, as we pointed out in our complaint, Mr. Carlson complained for a period of months, especially from December through April. He didn't even say you're violating it. He said, I think you might be, or I suspect there's a problem, or something like that. Is that what he said? No, Your Honor. Mr. Carlson did make claims to be respectful and to not call anybody a criminal, but he said this is not legally compliant. Okay, so that's what he said. This is not legally compliant. When did the cost accounting standards come in? When did he say, this is not legally compliant because of paragraph 7 of page 42 of the cost accounting standards? I'm not going to be able to answer that question to your satisfaction, Your Honor. And the reason is because of the 12B6 placement. There's no allegation of that? That's right, Your Honor. Because the physical records, the emails. What is the most specific allegation about what he complained about? The most specific allegation that we can produce is where we've attempted to characterize the types of complaints, where we've attempted to characterize the words that he, in fact, used. The reason that we've alleged... So cost accounting standards, did he say that? Yes, Your Honor. That's as close as he got to being... He did say cost accounting standard 420. The complaint, Your Honor, the allegations that we made in the complaint were the best that we can do because this happened over a period of months, and we are without the physical evidence to review those actual allegations that Mr. Carlson made. Of course, when Mr. Carlson was discharged, he no longer had access to that evidence, and DynCorp did. So what we think, Your Honor, is that given the totality of those circumstances as we've alleged them, there was a reasonable inference that Mr. Carlson could make that there was the potential for fraudulent activity to have been going on or to potentially go on in the future. So that's sufficient reasonable inference that there was the potential for maybe fraudulent activity at some point in the future? Your Honor, I sense that the court is... That's what you said just now. Yes, Your Honor. This is a really good opportunity to move to my second point, which is about the... Which is on this topic, Judge Motz, which is that the rule that we've proposed says that Mr. Carlson's fear has to be objectively reasonable under these circumstances. And that's why, Judge Statler, I say that the point of Mr. Carlson's complaints was that DynCorp controlled the information. And he saw what he saw, and it raised a red flag. And he brought out these complaints, and he did what he could in order to investigate and to dig into and to alleviate what were, to him, indicia of fraud and that what we say are reasonable under the circumstances. But I think we'll have to concede that Mr. Carlson is not able to put forward an allegation of fraud. But that's not required under 3738. As the Supreme Court held, DynCorp could be innocent of the fraud. The question is whether this belief that he had, and I think that there's no doubt that he had a subjective belief that there was potential fraud. And we certainly believe that under the circumstances, that was an objectively reasonable belief for him to have at that point. And now, as DynCorp mentioned in its supplemental letter to the court in the Jones-McNamara case, we had the Sixth Circuit now agreeing that this is an objectively reasonable test, and that the distinct possibility of litigation test that this court has stuck to prior to the Fura. Well, you dispute our distinct possibility standard. You don't think that's – you think we have to change that, and you prefer this reasonable belief standard, correct? Yes, Your Honor. Okay. But in discussing distinct possibility, we've held in the Mann case that that means an objectively reasonable – that has an objectively reasonable component. So I don't really understand – Yes, Your Honor. – what your problem is. And we briefed that – we briefed that – And I still don't understand it, so you better try again with me. Well, my point, Judge Motz, is that in the district court, we pointed out the language in Mann that talked about an objectively reasonable standard. And what we were trying to show there in Mann, what it failed to do, is that the objectively reasonable standard has in essence always been there. But it's an objectively reasonable belief in what? Under the distinct possibility of litigation standard, the requirement appears to have been, as Mann set it out, that the employee or the employer, depending upon where we are, has to have an objectively reasonable belief that litigation is a distinct possibility. Now, I think that this court took in Mann that language and said, well, that means that there has to be fraud, because there can't be a possibility – a reasonable possibility of litigation if there is no fraud. And I think that's exactly what happened in the district court in this case, where Judge O'Grady said that the – that what we're looking for is an allegation of fraud. And I think that the Congress went to pains with Fira and with Dodd-Frank to say that this is not right. What we're looking for is protected activity by an employee. And that employers, when they're faced with these sorts of complaints, especially complaints that strike at the heart of – that strike at the heart of the billing processes and accounting standards that deal with the manner in which they present bills to their – to the government, that you've got to – you've got to give these complaints more deference. And the proper – the proper response is not simply fire, but to shut out an employee so he can't get the information to complete his investigation, and then to fire him before he gets there. As the court noted, I think in Mann, the employee is protected even if the investigation is not complete, even if he doesn't – even if he doesn't get to the realization that here is the false claim I can come and present to the court. So that's the rule that we've proposed, Your Honors. We think that, yes, as Judge Montes, as you pointed out, it's really always been there. It's been there since Mann, at least. What has changed is that now you're not looking for an objectively reasonable belief that a false claims act claim would survive. You're looking for an objectively reasonable belief in something else, and my third point addresses what it is. The third point – and I'll be brief because my time is short – but my third point is that Congress said that the new thing we're looking for, or the additional thing, because they went back and made sure that there were two prongs, the new thing that we're looking for is an effort to stop fraud. And in Mr. Carlson's case, it's important to point out that you cannot stop a fraud that's occurred. At that point, it's unstoppable. You couldn't stop a fraud that happened in the past. If there is a campaign of fraudulent activity with recurring fraudulent transactions, it might be possible to intervene and stop those transactions yet to occur. But Congress clearly chose the word stop. And in this circumstance, I think it's important. It's important because Mr. Carlson saw something and he said something. And at that point, he was attempting to stop a fraud that, though he could not prove was occurring, he thought it was reasonably foreseeable that that was exactly what was happening. And I think that he's the exact kind of plaintiff that the Congress was attempting to protect by choosing the use of the word stop because it looked at its prospective in nature. You couldn't stop a fraud that's already occurred. Your Honors, with that, we'd ask that the Court reverse the District Court's grant of the 12B6 motion to dismiss, and I'll reserve the remainder of my time for rebuttal. Good morning, and may it please the Court. My name is Ed Ellis. I represent DynCorp International. I have Andrew Rogers with me here at the Council table who also worked on the brief. Your Honor, I'd like to discuss two things today. Number one is what should be the standard that the District Court applies in deciding whether a complaint has adequately pled a violation of Section 3730H of the False Claims Act, 31 U.S.C. 3730H. It is our view, and I think this is consistent with the prior case along the Fourth Circuit, that the plaintiff must allege opposition to a practice that creates an objectively reasonable possibility that a violation of the False Claims Act has occurred or is going to occur. Now, the Sixth Circuit formulation in Jones v. McNair, which we supplemented our brief with because it was decided very close to the time when we filed our brief, I think would state that there has to be an objectively and subjectively reasonable belief that what the plaintiff was complaining about was a violation of 3729A, which is the substantive provision of the False Claims Act. I think those standards are actually very close to one another. One of them focuses more on the objective reality. The other one focuses on the state of mind of the plaintiff. But in either case, they require that there be some objectively reasonable basis to believe that a False Claims Act violation is occurring or is about to occur. And I entirely agree with Mr. Small's argument that it's supposed to prevent, among other things, violations that haven't occurred yet. But I think it's also designed to protect the government from violations that are in the course of occurring or that have occurred in the past and they're only uncovered later on. As I'm sure the Court is aware, Section 3730H first appeared in the statute in 1986, and it's the amendments that occurred since then that give rise to this case. Under Section 3730H, as originally enacted, the courts applied this distinct possibility of litigation test. And probably the Mann case in the Fourth Circuit is the best explication of what that means. It essentially required that the plaintiff be engaged in activities in furtherance of a quitam action, which is the action, as we know, that is brought by an individual in the name of the government. The distinct possibility of litigation test is the only one that mattered because the original statute only protected someone who was taking acts in furtherance of a quitam action. So then in 2009 and 2010, the statute was amended. It was actually amended twice, and as the briefing, I think, indicates, the First Amendment to the statute in 2009 left a bit of a garbled sentence at the end of Section 3730H, which was fixed by the Dodd-Frank Act in 2010. Essentially what Dodd-Frank did was add a second protected activity, what we call in our brief the second prompt. The first prompt being someone who's preparing to bring a False Claims Act case. The second one being someone who's simply trying to stop a violation of the False Claims Act. Now, they didn't- It was preventing one as well. Yeah, prevent, stop, or unravel whatever the situation could be. Now, under the old statute, the plaintiff must have been investigating something that had a distinct possibility of leading to a quitam action. I don't think that the statute's been completely unraveled to the point where that standard doesn't apply. You simply have to add to it the efforts by some individual to stop a False Claims Act violation. And so I would suggest that cases like Mann, cases like United States' X. Rel. Owens versus Kuwaiti, and Glenn versus EDO Corporation are all cases that are still very much vital in the post-amendment year. But they're not dispositive anymore because we know that Dodd-Frank extended the protection. That's correct, Your Honor, but I think- So whatever the distinct possibility was, whatever that means, it's more protection now. It's that plus. It's the plus that we have to determine in terms of protection. It gave more protection. I think it protected more activities, Your Honor. I don't think it necessarily increased protection over the activities that are already there. Statute, because they were concerned with making sure that you don't fire people who are trying to prevent violation. As opposed to the other way, it was a distinct possibility that you're trying to stop something that's going to lead to a claim, or quitam, or what is going to be a False Claim Act. Here, it's any effort. It's no limitation. Any effort that is designed, reasonably believed, that you're trying to prevent those violations from occurring. That's more. There has to be more. Now, what the more is, I guess, to be determined, but it has to be more. Well, Your Honor, our suggestion is that the more is the efforts to stop, and the standard should be, it still has to be efforts to stop something that actually could be a False Claims Act violation. That's what he said. I didn't think that you had really a problem with the standard. I don't think I really do, Your Honor. I thought that even though you all dance around the standard a lot, I thought it came out at the same place. I think it probably does, Your Honor. Advance from his articulation of the standard, why you would still win. Well, our – well, let's – our view is that the key allegations in the Second Amendment complaint, which is what we eventually got to, are two of them, two sets. One is Paragraphs – I think it's 63 to 67 of the First Amendment complaint, and I'll get you a cite to that momentarily. I thought we were in the Second Amendment. I'm sorry, Second Amendment complaint, Your Honor. Paragraphs 73 to 76, which is Joint Appendix 97, they're all on the same page. Those paragraphs allege that the plaintiff engaged in persistent and ongoing opposition to the shifting of overhead away from an appropriate overhead charge code. 74 is he sent emails imploring Dine Court management to return access to the overhead code. He objected, noting apparently inside the billing system that he didn't agree with the process, and he complained to his superiors in person. Now, the other part of the complaint that makes a fairly clear allegation of what Mr. Carlson is doing is found on page 84, which is on – I'm sorry. Paragraph 84, yes, page Joint Appendix 98, which says essentially that Mr. Carlson's objections were about shifting indirect costs into a dummy code from an old project, and that created an imminent risk that the government would be stuck with false bills. Now, the question, if you understand overhead and how overhead works, if you move money out of an overhead code, put it anywhere, it reduces the amount of money that's in the overhead pool that gets thereby distributed through the indirect cost rate to the government contracts held by Dine Court. So if you take money out of an overhead code, by definition, you're reducing the overhead cost. You can't possibly be increasing the cost to the government fraudulently. It's simply an accounting transfer. Well, I think his concern was the use of a dummy code that had nothing to do with the project for which the overhead was being performed. That's correct, Your Honor. Mr. Carlson, well, he uses the pejorative term dummy code, but it's an unbillable code from a Zimbabwe project, which we don't know anything about from the complaint, but it's an unbillable code. And by virtue of the fact that it's an unbillable code for an old, closed-out project, by definition, it's not going to get into the overhead rate and increase the cost to the government. It has exactly the opposite effect of what the government's concerned about and what Congress was concerned about in passing the statute. Is that what this complaint is? I'm sorry, Your Honor? Is that really what he's saying, that the risk is to the government? I think so. Well, it would seem to me, well, you correct me in terms of laypersons understand it, it seems to me he's saying that you're getting the contracts by making yourself attracted because your indirect costs are low and to the point where it's noticeably low, much lower than normal bidder. And then, correct me if I'm wrong, and then what you're doing, if someone looked at your overhead cost, it's somewhere else in another place, and therefore it's not attributed there. So you say, well, look, it's low because that's so low. But then it's there. But then once you get the contract, then alleged, you will shift that overhead into it and justify a high. So it's like a loss leader. I get it by saying I have low indirect costs, and then I shift that, and the government gets stuck with that overhead cost that if you had bid it properly in the first place, you'd have been fairly competitive with the rest of the world and not way under bidding to get it and then later pile on. That's what I understand his prevention was. Am I wrong? Is that what he's saying? I think you're partly right. Okay. Tell me the part that's wrong about that. The part that's wrong is I don't believe he makes the allegation anywhere that the money is shifted behind the scenes. I'm sorry, I apologize for that. That he ever makes the allegation that the money gets shifted behind the scenes into some account that would then feed a government contract somewhere. That's never anywhere in the complaint. And if it were, I think we say in our brief, that might present a different story. But, you know, the government allows somebody to eat. Eat their own costs. Right, eat their own costs, be more competitive. There's nothing wrong with doing that. Now, you know, the supposition that they would take that money and somehow back channel it into another account, you know, I suppose that might make a case somewhere, but that's not the case it's alleged. Can we take what Judge Gregory said and make this addition? I think he's saying with all of this underbidding, in the future, you're going to put greater costs. But as I understand it, you would have to negotiate those future costs. Is that not right? Overhead cost rates under the system that these contracts are bid under and that are alleged in the complaint are negotiated, yes. What would have to happen? You couldn't just automatically put in a whole bunch. No. No, they would have to. I mean, what companies have been convicted for in the past is taking a whole lot of bad money, putting it into another account that feeds, and then they come in and negotiate. Right, which is this first situation you were talking about. Right, but that's not what's alleged. Now, the one thing that is alleged, and I'll cover this now because I think it's important, and this is alleged in Mr. Carlson's brief before this court, is that this is really a problem presented by the theory of the implied certification problem. The implied false certification problem. I've also seen it in the implied false certification problem. There is currently a case in the U.S. Supreme Court where a cert was granted on, I think it's an Escobar case, United Health Services versus Escobar, to decide ultimately the validity of that theory. The Fourth Circuit in the triple canopy case has accepted the theory of false certification. But here's the way Mr. Carlson's false certification goes. He says that if you take money out of an indirect cost, or if you decline to put it in. If you don't bill that indirect cost. If you don't bill it, you put it somewhere else, that that somehow. Is a false certification. Is a false certification, and that makes every contract, every invoice you send for every year that you have an accounting decision made like that, makes that an implied false certification because you've implied that you are in compliance with the, I'm sorry, you've certified that you're in compliance with the. Why is that wrong? Well, Your Honor, the law, at least in the Fourth Circuit, for many, many years, has required number one, scienter, and number two, materiality. You can go back to the, I think it's the Harrison versus Savannah River case back in the late 90s, and I think there's probably references to it in some of the more recent cases under the False Claims Act. You know, Mr. Carlson hasn't alleged that anybody did whatever they did for the purpose of defrauding the government. Furthermore, it's not material. I mean, this is a movement of money away from a government cost center that will not cause the government to pay excessive money in the future. I thought you had some cases or something in your papers which said this was perfectly all right. Well, we do think it's perfectly all right, Your Honor, but I'm just saying, and take it to the most extreme measure, I still think you have a, you know, he has a problem with materiality. I mean, he says, well, if we had certified or if we had refused to certify that we were in compliance with the cost accounting standards, the government wouldn't have awarded the contract. Well, that may or may not be. The critical point is, though, if we told the government that we had moved some costs out of the cost center, that moved it over here so that their cost was lower, that's not going to be material to the government. They're not going to want to use it. Well, wait a minute. I'm glad you, that's why you clarified my understanding of it. That's why I appreciate that. But the question about this, the certification, and you said even though the question is not whether or not the government would pay more money, is there a problem with when you award bids, you try to get the best bidder, contractor, period. But a big part of that is someone who comes in a lot lower. But in a sense, this is theoretically in terms of, isn't it sort of a fraud perhaps to say, I'm going to get the contract from somebody better just because I'm going to eat my overhead to make myself look competitive. But if you really did it fairly and put what your real overhead is, then in fact the government would be looking at more competitively in terms of that. You know, is that not making us different? I think it probably depends on what type of contract it is, Your Honor. I don't purport to be an expert in government contracting, but I know that in certain situations the government is purely competing on price. Right. In other situations they're more interested in quality. You know, there's a lot of debate over what's better or what's worse. Which is this? Is this quality or just price? Do we know? I'm not sure that the complaint tells us, Your Honor. The complaint tells us that it's a multi-year non-exclusive contract I think, but I don't think it says anything more than that. But in any event, in this particular case, the cost is being reduced by taking, first of all, assuming, and I don't even think the complaint is clear that the money from the Zimbabwe or from the cost center that went to the Zimbabwe unbillable account had anything to do with the AID contract that Mr. Carlson was working on. But assuming it did, again, it's lowered the cost. It hasn't changed the people who are doing the work. It hasn't changed the product. It's just lowered the cost. So I don't, under the circumstances, see how any of this is contributing to fraud against the government. Why did your client fire him? It's not in the record, Your Honor. I know it. That's why we, is this 12B-6? It was 12B-6, Your Honor. That's why it's not in the record perhaps. Because he says the only people who are supposedly real is himself and somebody else, and that other person, he said, alleged that he knows that person was not fired because of real. Your Honor, if I had to, you know, defend this case on the reason he was terminated today, I couldn't do it because the case was dismissed on the ground that it wasn't protected activity. At least Judge O'Grady didn't think so in the Eastern District of Virginia. So I can't defend it. I really don't know why. As a matter of law, what he alleged could never be reasonably considered to be trying to prevent fraud against the government, whether the certification being false or otherwise. That's correct. As a matter of law, that can't be. As a matter of law. Even if it was one that was related to quality, not just price, because we don't know which one this is. Well, he hasn't alleged that we have falsely represented the quality of the product or anything of that nature. No, it related to the certification. In other words, that would somehow skew the assessment of his bid when really quality is what you wanted, but then you're persuaded by this underbidding of your indirect costs that persuaded that decision. That's what would be the question. I think the only allegation in the complaint is that the company, DynCorp's, indirect costs were low. There's no explanation for – Actually, Your Honor, I don't think the company got the contract. I think somebody else was awarded the contract, so I don't know if it's ongoing or not, and I don't know who the successful bidder was. So how could you have indirect – oh, these were – they were anticipating. They were estimating their future indirect costs. The complaint's a little bit vague. It isn't clear whether the costs were being actually taken out of the AID IQL contract that Mr. Cross was working on or they were being taken out of something else, and then – Yeah, that was my confusion. I was trying to understand and clarify. Maybe on rebuttal, maybe we'll hear some other, but I see what you're saying. Thank you. I think the court has asked the questions for which I would have given answers, and I thank you very much, and we request that the court below be affirmed. Thank you. Thank you. Rebuttal, please. So is this an ongoing contract? What was this? Yes, Your Honor. It's not quite that simple because Mr. Carlson complained about conduct that touched multiple contracts, but we did focus our complaint on the USAID rule of law indefinite quantity contract, which would be ongoing. It's a service-based contract. And when was it originally entered into? Well, Mr. Carlson submitted the bid for that contract on the day he was fired. Well, it wasn't ongoing then when he made his complaint? No, Your Honor, and that's why we are pointing to the efforts to – Well, that's what I asked in the beginning if it was ongoing, and you said yes, I thought. Oh, I misunderstood, Judge Motsch. I thought you were asking if this was a contract that had an indefinite quantity, which this one did. Your Honors, I'd like to use my rebuttal really to touch just a few quick points. One of the points is in terms of what is it that would inure to the detriment of the government under your theory? Yes, Judge Greger, we have three fears of fraud that Mr. Carlson had. The first is that first, when the overhead code was taken away, that his staff would be really placed in a position where they could do nothing but place their overhead billings into actively billing accounts. And this is what underlied the initial complaints that Mr. Carlson made. Of course, this was happening as the memorandum that DynCorp – So, to put this in plain language, you're saying that because of the change in the codes, they would have to put it on somebody's government contract as overhead? Is that what you're alleging? No, Your Honor. What we're saying is that without an overhead code – There were stages here. Initially, when the overhead code was taken away, Mr. Carlson's staff were, of course, operating in an environment where there are layoffs happening, where Mr. Carlson is himself laying people off. Forget about the layoffs. We're not going to be an ombudsman about layoffs. We're talking about what was it about the overhead that would make this somehow become a fraud against the government? Judge Gregory, the reason I answered your question by pointing to the layoffs is because they didn't have a place to put their overhead, and they would appear to their superiors to be wasting time. And Mr. Carlson's first fear is that without appropriate overhead codes, in order to justify their jobs – He would look bad as an employee? Not Mr. Carlson. His staff would start stashing, over-commit fraud.  Is that what you're saying? Yes, Your Honor. I thought his staff was going to commit fraud. That is the first fear. I thought they were supposed to put it in that Zimbabwe closed account. There was a place for it. Yes, Judge Session. That's the second stage. How much time elapsed between these two stages? I don't know specifically how much time elapsed between the taking away of the overhead code and the addition of Zimbabwe. Well, if 24 hours elapsed, there wasn't a lot of time. No, Your Honor. Well, that's what I'm asking is how much time. My recollection, I think it's in the Joint Appendix in our complaint, but my recollection is that it's a period of weeks. There's a period of five months, however, where Mr. Carlson is objecting to a series of these practices. And that gets to the second fear of fraud that Mr. Carlson had as he came up with these complaints. And that's that there would be false CAS certificates. And we do point to a specific CAS certification that Mr. Carlson himself delivered to the government under protest. And that was the certification on the ROL IQC. Opposing counsel mentions that there's really no materiality. Is that in that complaint somewhere? Yes, Judge Satcher. That's in the complaint. Your discussion of all of his complaints is really general, except you talk about one April 3rd memo. And so the other side put that in the record, and it doesn't have any of these complaints. It's a very odd situation here. Your Honor, my time's expired. You can answer that question. Your Honor, the situation we're placed in due to the unavailability of the evidence is to go off Mr. Carlson's recollection of the complaints that he made over a period of five months. Owing to the necessary vagaries of what had happened and the fact that he was a good employee and not transferring property outside of the company, we think that the proper thing for the district court to have done was to allow discovery to take place so we can see these complaints on the paper. If the certification didn't lead to more costs or expense to the government, why is it material? Your Honor, to answer that question, we would look at what this court just said materiality meant in triple canopy. And that's that materiality of a false statement turns on whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action. And we allege without the CAS certification and the ROL-IQC bid, it would not have been awarded. And my opposing counsel was incorrect. DynCorp did receive, as I understand it, the ROL-IQC bid. They did receive it. I don't know if they've done any work under that contract, but they did receive it. For those reasons, Your Honor, we'd ask that the court reverse the district court's decision. All right. We're going to ask our clerk to adjourn court, and then we're going to come down and greet the lawyers. And then if there are any students left that have any questions, we'll come back here and entertain those questions, none of them about the cases where the lawyers can appear before us today, but any general questions. Okay. Thank you very much. This honorable court stands adjourned, signing die. God save the United States. This honorable court.
judges: Diana Gribbon Motz, Roger L. Gregory, Stephanie D. Thacker